671 P.2d 912

**The STATE of Arizona, Appellee,**

v.

**Kenneth O. ASHELMAN, aka Steven Douglas Foster, aka David Steven Foster, Appellant.**

No. 2 CA–CR 2637.

Court of Appeals of Arizona, Division 2.

Feb. 17, 1983.

Reconsideration Denied May 12, 1983.

Review Granted June 22, 1983.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Cary Sandman, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was convicted of one count of kidnapping, two counts of sexual assault, and one count of theft. The offenses were found to have been of a dangerous nature. He was sentenced to 21 years for the kidnapping and the aggravated assaults and to an additional consecutive sentence of seven and one-half years for theft.

On appeal he contends: (1) That his confession was obtained in violation of his *Miranda* rights; (2) that the court erred in allowing admission of subsequent bad acts; (3) that the court erred in allowing the admission of an umbrella and knife; (4) that he was denied due process when the court allowed newly discovered evidence to be admitted against him.

The record reveals that appellant contacted a real estate salesperson for the ostensible purpose of purchasing real estate. He represented himself as David Foster, owner of the Foster Freeze Ice Cream chain in Oregon. During July 1981, the salesperson (A) showed appellant various properties. On several occasions while they were on these outings, he attempted to kiss her. On July 25, while they were viewing a vacant house, appellant threatened her with a knife and forced her to engage in oral sex, twice.

Appellant attempted to show that the sexual conduct was mutually consensual, that they had kissed on two different days prior to the assault, had engaged in intimate conversations, and that she had encouraged him. He attempted to establish that A's motive for consenting and encouraging the sexual acts was to make sure that he bought real estate from her.

B, a real estate saleswoman in Phoenix, testified that on the day following the assault in Tucson, appellant came to an open house being handled by her in Phoenix. Appellant made arrangements to meet her on July 28 and represented himself to be one of the owners of Foster Freeze Ice Cream chain. When she met with him at the appointed time to show him some real estate, he threatened her with a knife and forced her to perform oral sex.

A Lake Havasu real estate woman, C, testified that on August 1, 1981, she met appellant who introduced himself as Anthony Scott. When she was showing him a house on August 3, 1981, he threatened her with a knife and attempted sexual assault. C escaped.

On August 27, while in custody, appellant unequivocally invoked his right to remain silent and his right to counsel under the

Fifth, Sixth and Fourteenth Amendments by informing the authorities that he did not wish to make any statements without having consulted a lawyer. Nevertheless, Detective Whitte, who had been sent to Las Vegas by the Pima County Sheriff's Department persisted in discussing certain aspects of the crime with appellant. Specifically, Detective Whitte told appellant that the Tucson victim was having difficulties because her insurance company was pressuring her to settle the claim on her car which had been taken by appellant and had not yet been located. The detective also informed appellant that warrants were out for his arrest in two other Arizona counties and that physical evidence such as fingerprints and hair samples would be taken from appellant.

While the physical evidence was being taken, appellant made some inquiries of the detective concerning the Pima County Jail facilities. During this contact of about one hour, appellant suggested to Detective Whitte that the missing car could be found within a one mile area near the house where appellant had been staying in Tucson.

Four days later, Detective Whitte returned to Las Vegas to transport appellant back to Tucson. While preparations were being made for their departure, appellant asked whether the victim's car had been located. Upon learning that it had not, appellant asked for a map of Tucson so he could show the detective the location of the car. Whitte had no map with him and appellant then agreed to take him to the car's location upon their return to Tucson. This was appellant's suggestion. It did not come from the detective. This appellant did early the next day, September 2.

Later that same day, appellant had his initial appearance and bond was set at $1,000,000. Shortly thereafter, on the same day, Whitte learned that appellant had requested a conference with him [1] in the holding area of the courthouse. The following

testimony was given with reference to the ensuing conversation:

"A. We went into an office that was vacant and he made some comments as to, 'Look, I'm not going to deny the sexual contact or whatever, but it was consentual [sic], or it wasn't rape' or something.

He told me that he felt that there hadn't been an auto theft because that should be dropped because the car wasn't taken out of town or out of state, which was evidenced by the fact that this was where he left it.

He told me that if the prosecutor persisted in going forward with these charges that he was going to make the victim look bad in the press, t.v., this type of thing. I asked him at the time if he would give a taped statement on his side of the story, and he again refused. So, I took him back to the elevator and they took him back downstairs.

Q. In the particular conversation at the County Attorney's Office did he ever indicate to you that he wanted to have his attorney present?

A. No, he didn't.

Q. Did you ever force him or coerce him to speak with you at that time?

A. No, I did not.

Q. Did you ever question him at that time? Or was he giving you more of his version of what he felt the facts showed?

A. It was a little of both. He was giving me his version. He did say something about—I could understand where he says about consentual [sic] and this and that. But the problem is really—Going to be tough to get over the problem about the knife. That is especially so: Well, she's not the only one. Linda is not the only one who tells about the knife. There were two girls. He said, well, you can't use that because I haven't been convicted of those yet, or something. It has nothing to do with this case. He also said something like bringing in witnesses that said that he had sex with him without a knife and that he didn't need a knife to do that.

1. This differs from *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)

where the second set of officers went to the jail to see him on their own initiative.

474

Q. Okay. And so, Detective Witte [sic], was that idea to speak with Mr. Foster your idea? Or his idea?

A. I had no intention of speaking until the Detective Chávez told me that he told him he wanted to talk to him [sic]."

Appellant claims it was his understanding that he and Whitte agreed that if he disclosed the location of the car to save the victim from financial loss, this information would not be used against him. In fact, these statements were not used against appellant at trial since the prosecution did not attempt to have the statements admitted.

 Appellant argues however, that he believed Whitte breached their agreement because information concerning the car was used to effectuate strict conditions for pretrial release. Appellant claims that he felt betrayed and that, as a direct response to this feeling of betrayal, he sent for Whitte and made the further incriminating statements. He contends that a direct link exists between the initial police misconduct in eliciting statements concerning the car and the final incriminating statements concerning the sexual conduct which he made several days later. We do not agree.

In determining whether appellant's confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we keep in mind the following principles. In *Miranda* the United States Supreme Court enunciated the general rule that once an accused requests an attorney, all questioning must cease. In *Edwards v. Arizona,* supra, the court recognized as a qualification to this general rule that nothing prohibits police from listening to statements which are clearly voluntary, such as where the accused himself initiates the conversation with the police. A confession, however, is not "voluntary" if it is the "... product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 303, 100 S.Ct. 1682, 1691, 64 L.Ed.2d 297, 309 (1980).

According to *Edwards,* we must not only inquire as to whether appellant's statements were voluntary, but we must also decide whether appellant validly waived his right to have counsel present. Such waiver "... must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right of privilege...." 451 U.S. at 482, 101 S.Ct. at 1884.

Thus, the critical question to be answered is whether appellant "initiated" the conversation in which he made the incriminating statements or whether the statements were the product of police conduct which the police should have known was reasonably likely to elicit an incriminating response. Under Arizona law, the state has the burden of proving that statements of an accused are voluntary. *State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982). If appellant "initiated" the conversation, we can conclude that the statements were given voluntarily and appellant knowingly and intelligently decided to forego his right to have counsel present.

Whitte's initial comments concerning the hardship faced by the victim because her car was missing clearly fall under the standard set by *Innis* since the comments constituted "words or action ... [which were] ... reasonably likely to elicit an incriminating response." 446 U.S. at 302,[2] 100 S.Ct. at 1690. The statements given by appellant in response to this conduct, however, were not admitted as evidence against him at trial. We must thus determine whether the final incriminating statements appellant made on September 2 were the direct result of Whitte's initial misconduct or whether the link between that misconduct and appellant's request to see the detective on September 2 is so attenuated that the taint of the initial misconduct was dissipated to the extent that the conversation was "initiated" by appellant.

For the following reasons we find that the conversation which resulted in appel-

2. Whitte's conduct is somewhat reminiscent of the "Christian burial speech" in *Brewer v. Wil-* *liams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

lant's confession was "initiated" by appellant. First, four days intervened between Whitte's improper questioning and appellant's confession. Second, the conversation took place at appellant's request. Third, the initial interrogation did not involve the same crime to which appellant confessed. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Fourth, appellant made no allegations of threats, mistreatment or undue pressure.

The fact that the conversation occurred at the request of appellant weighs heavily toward a finding of voluntariness. We recognize that this fact alone is not determinative. *Stumes v. Solem,* 671 F.2d 1150 (8th Cir.1982); *State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982). In both *Stumes* and *Emery,* the incriminating conversations occurred at the request of the accused. Nevertheless, in both cases, the courts held the confessions to be involuntary because they found the incriminating conversations to be a mere continuation of a previous improper interrogation. Four days, a significantly longer time period than in either *Stumes* and *Emery,* intervened between appellant's confession and the initial violation of his rights. The length of the intervening time period tends to decrease the likelihood that appellant's request to see Whitte constituted a continuation of their prior conversation. Moreover, the incriminating remarks in question did not directly concern the crime which Whitte discussed with appellant. Whitte inquired about the location of the victim's car, but never referred to the sexual conduct charges. Although appellant was in custody during the four intervening days, he was never subjected to any threats, mistreatment, promises, or undue pressure.

Although appellant's testimony proposes a tenuous link between the violation of his rights and the final incriminating conversation, we find that because he requested the conference with Whitte after an intervening time period of several days, this link is too weak to support an inference that the incriminating statements were the result of police conduct which the police should have reasonably forseen would elicit an incrimi-

nating response. We note that appellant testified at the suppression hearing that he was in part motivated to make the incriminating statements by his concern for the victim. Furthermore, his explanation as to why he made the statements in the holding area, that he felt betrayed, does not ring true. The context of the statement does not show a man angered by betrayal, but a man trying to convince the officer to drop the charges. The motivation for this statement was not his prior disclosure of the location of his car, as the dissent says. He would have made this statement in any event. We find the state has carried its burden of proof, demonstrating that appellant "initiated" the incriminating conversation.

## ADMISSION OF SUBSEQUENT BAD ACTS

■ Appellant challenges the admission of evidence of the episodes which occurred in Phoenix and Lake Havasu subsequent to the offense in the instant case. He questions whether there being subsequent bad acts, rather than prior, is a reason to exclude the evidence. No such distinction is made in Rule 404(b), Arizona Rules of Evidence, 17A A.R.S. and the Arizona cases have upheld the admissibility of relevant subsequent acts. *State v. Martinez,* 127 Ariz. 444, 622 P.2d 3 (1980); *State v. Price,* 123 Ariz. 166, 598 P.2d 985 (1979); *State v. Tuell,* 112 Ariz. 340, 541 P.2d 1142 (1975).

■ Proper reasons for the admissibility of subsequent bad acts are to prove intent and identity. Intent is clearly an issue since appellant contends the acts were consensual. Although identity does not appear to be so clearly in issue, the subsequent acts involving the same distinctive modus operandi solidify the Tucson victim's identification of appellant. The acts were distinctive, displaying a peculiarity required by *State v. Tuell,* supra, thus, demonstrating relevance. The prosecutor's summarization to the trial court is helpful:

"And here we have in each particular case we have three young women who are real estate agents.

We have the young women who are driving him around in their car, because he said he needs. to invest in this property.

Each case we have him pulling a knife on the victim.

We have within the first case, actually assaulting the victim, and taking some of her property, including the car.

In the second case, we have him just taking property and the woman escapes; and the third case we have him pulling a knife and attempting to sexually assault the woman and she gets out of the car and he takes the car."

Appellant contends that the other acts, even though relevant, should have been excluded because their prejudicial impact outweighed their probative value. He has not specified particular unfair prejudice. Rule 403, Arizona Rules of Evidence, 17A A.R.S. provides for the exclusion of relevant evidence only when its probative value is "substantially" outweighed by the danger of unfair prejudice. The Kentucky Supreme Court, obviously annoyed with the generalized usage of the term "prejudice", commented:

"A good deal of tripe has grown up around the question of what sort of prejudice should entitle a defendant to a separate trial. Perhaps the rule itself is not sufficiently explicit. 'Prejudiced' means *unfairly* prejudiced. A defendant is prejudiced, of course, by being tried at all." *Ware v. Commonwealth,* 537 S.W.2d 174, 176 (Ky.1976) (Emphasis in original)

We find no abuse of the trial court's discretion in admitting the subsequent bad acts.

## ADMISSION OF THE UMBRELLA AND KNIFE

■ On the day of the assault, appellant carried a black umbrella. He had left the umbrella in the car when they went to inspect a vacant house. While in the house, he directed the victim to sit on two stacked mattresses and close her eyes because he

was going to give her a gift. She complied and heard rustling sounds. He instructed her to hold out her hand. He placed his penis in her hand and the victim testified, "I panicked, having a man standing there, I'm holding his penis, so I ended up thrown on the bed. At that point, I guess I put my hand out to break the fall or whatever, and had a hold of his wrist, where he was holding a very large steak knife. At that point I'm afraid you got to get pretty calm." She had seen a black umbrella cover on the edge of the bed. When the car was located on September 2, a black umbrella was found in it and was turned over to the detectives. Whitte testified that he had received the umbrella from one of the other detectives and put it aside in his office, opened it and a knife fell out. The umbrella and knife were then placed in the usual property control procedures. The victim identified the knife as looking like the one with which she had been threatened. Mr. Seekatz, the owner of the house where appellant had stayed, testified that the knife looked like one of his steak knives which disappeared when appellant left.

The knife in question was identified by the victim as looking like the one used to threaten her, and it was also identified as being the knife missing from Mr. Seekatz' house after appellant left. We find that the foundation for the admission was sufficiently established. *State v. Brookshire,* 107 Ariz. 21, 480 P.2d 985 (1971). The admission of evidence will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Macumber,* 119 Ariz. 516, 582 P.2d 162 (1978), cert. den. 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). The knife and umbrella were properly admitted, both under a sufficient showing of chain of custody and through witness identification.

## ADMISSION OF TESTIMONY

■ Finally appellant contends that it was error for the trial court to allow testimony from one of the victims that he had sexually assaulted her. Appellant had known from the beginning that the victim

would be called to testify that he had kidnapped her and robbed her at knifepoint. However, the night after the first day of trial, the victim told the prosecutor for the first time that he had also sexually assaulted her. At trial the next day, the prosecutor informed both defense counsel and the judge of the additional evidence and asked that the victim be allowed to testify concerning the event. The trial judge agreed but first provided defense counsel the opportunity to interview the victim. Counsel conducted the interview and the testimony was admitted in evidence over his continuing objection.

Although counsel interviewed the witness, he was unable to articulate to the trial judge how prior knowledge about this aspect of her testimony would have altered or affected his trial strategy. Nor did he request that the trial court allow him additional time to further investigate. Appellant has not shown this court how he was prejudiced by admission of the testimony nor can we find any. See *State v. Lawrence,* 123 Ariz. 301, 599 P.2d 754 (1979). Neither do we believe that he was denied due process of law. See *State v. Schreiber,* 115 Ariz. 555, 566 P.2d 1031 (1977).

Affirmed.

BIRDSALL, J., concurs.

HATHAWAY, Judge, dissenting.

After appellant invoked his right to remain silent and his right to counsel, the detective in brazen disregard of restraints imposed by a veritable mountain of authority persisted in discussing the case with him, as the majority sets forth. Undoubtedly the opportunity extended appellant to cooperate and ingratiate himself to the authorities and to color himself a "good guy" was more effective in eliciting evidence than a rubber hose.

By implicating himself in the theft of the automobile, appellant "let the cat out of the bag." The subsequent incriminating statements naturally emanated from the first conversation and would not have occurred but for the initial police misconduct.

The conversation begun by Whitte was of necessity interrupted when he returned to Tucson to follow up on the information obtained from appellant and to ready appellant's return to Tucson. To say that the four-day interim, while appellant awaited in the coercive atmosphere inherent in his custodial detention, so attenuated the violation as to dissipate the taint, in my view winks at reality. This is particularly true since appellant was not afforded the opportunity to consult an attorney at any time during the four days of detention even though he had unequivocally asserted his right to counsel.

Appellant's interest in whether he had been helpful to the detective was predictable, and in my opinion the product of the police misconduct. The authorities are all cited in the majority opinion. I simply disagree with their application to the facts in this case. The majority acknowledges that the detective's conduct is "somewhat reminiscent" of the "Christian burial speech" in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). There, the conversation between officers calculatedly elicited a response from the defendant. What was not permitted indirectly, should neither succeed through a direct disregard of appellant's attempt to invoke his constitutional rights. I would reverse.